**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**REGINALD ADAMS,**

                     **Plaintiff,**

          **v.**

**CITY OF NEW ORLEANS**
**HARRY CONNICK**
**LEON CANNIZZARO, JR.**
**SAM GEBBIA**
**MARTIN VENEZIA**
**FRANK RUIZ**
**JERRY URSIN**
**RONALD BODENHEIMER**
**JOHN DOE 1**
**JANE DOE 1**
**JOHN AND JANE DOES 2-10**
**ABC INSURANCE COMPANIES 1-10**

                     **Defendants.**

**Civil Action No. 15-1543**

**JURY TRIAL DEMANDED**

## COMPLAINT

### NATURE OF THE ACTION

1.       Plaintiff Reginald Adams spent 34 years in prison following his wrongful conviction for the murder of Cathy Ulfers.  The State's case against Mr. Adams was based entirely on a coerced confession that he made to the police after almost five hours of interrogation, during which they plied him with alcohol and drugs.  No physical evidence or eyewitness ever linked Mr. Adams to the crime.

2.       After more than three decades, and after the police and prosecutorial misconduct that led to Mr. Adams's conviction came to light, the Orleans Parish District

{N3023333.1}

Attorney's Office (the "DA's Office") joined his motion for a new trial.  That motion was granted, and the DA's Office dismissed all charges against him.  Mr. Adams now seeks to hold accountable those responsible for depriving him of more than half of his life as a free man.

3.      On September 20, 1980, Mr. Adams was charged with Mrs. Ulfers's murder.  Three years later, in August 1983, Mr. Adams was convicted by a jury in the Orleans Parish Criminal District Court, Section A, No. 278-951.  The Louisiana Supreme Court reversed that conviction in 1989.  Mr. Adams was then retried on amended charges of second-degree murder.  A divided jury convicted him 10-2 in July 1990, and he was sentenced to life without parole.  This second conviction was affirmed on appeal in 1992, and the Louisiana Supreme Court denied Mr. Adams's writ in December 1994.

4.      The only evidence of Mr. Adams's guilt was his coerced confession, obtained by the two New Orleans Police Department ("NOPD") detectives who investigated Mrs. Ulfers's murder — Detectives Martin Venezia and Sam Gebbia.  At the time Detectives Venezia and Gebbia questioned Mr. Adams and obtained his confession, they were already aware of critical exculpatory evidence implicating Mrs. Ulfers's husband, NOPD officer Ronald Ulfers, in the crime.

5.      Moreover, by the time Detectives Venezia and Gebbia testified at trial, they were aware of additional exculpatory evidence implicating two other suspects in the murder.  Specifically, the murder weapon and jewelry from the Ulfers's home was found in the possession of two suspects who had no connection to Mr. Adams.

6.      Detectives Venezia and Gebbia perjured themselves at Mr. Adams's trials by denying the existence of this evidence.  The prosecutors also concealed this evidence from Mr. Adams and his counsel.

7.      In February 2015, after Mr. Adams was released, Detective Gebbia told Louisiana Assistant Attorney General Colin Clark that Mr. Ulfers was always "suspicious" to him.  Detective Gebbia cited a number of facts that made him think Mr. Ulfers had committed the murder, including that Mr. Ulfers attended a New Orleans Saints game with another woman on the day of the murder, suggesting to Detective Gebbia that Mr. Ulfers was cheating on his wife.  Further, divorce papers were found thereafter in the Ulfers's house, which Detective Gebbia thought suggested that Mrs. Ulfers was planning to leave Mr. Ulfers.  Detective Gebbia also found Mr. Ulfers's story regarding why he was not at home at the time of the murder to be incredible.  Additionally, shortly after Mrs. Ulfers was killed, while Detective Gebbia was speaking with Mrs. Ulfers's father, retired NOPD Major John Span, Major Span pointed to Mr. Ulfers and aggressively asked, "Does that [expletive] have anything to do with this?"

8.      Detective Gebbia was so convinced that Mr. Ulfers was a suspect that, when he saw him at the NOPD Detective's Bureau during the pendency of the investigation, he said to him something along the lines of, "Ron, I know you had something to do with your wife's murder, and I'll see you behind bars one day."  The confrontation turned physical, and other people had to pull Detective Gebbia and Mr. Ulfers apart.  According to Detective Gebbia, even Mr. Ulfers thought that he was a suspect after their interaction.

9.      Detective Gebbia was not the only member of the NOPD to harbor these suspicions about Mr. Ulfers.  The suspicions were institutional at the NOPD, and they reached the organization's highest levels.  According to a 1982 decision from the Louisiana Fourth Circuit Court of Appeal, NOPD Superintendent James C. Parson personally instructed Detectives Venezia and Gebbia "to include [Mr.] Ulfers as a suspect" in Mrs. Ulfers's murder, and "to get a warrant for stolen auto parts in order to put 'pressure' on [him]."  As the court explained in the

same opinion, "[f]or a number of years, [Mr.] Ulfers had been purchasing, restoring and reselling old and wrecked cars," and "when [Detectives] Venezia and Gebbia were investigating the crime scene, they noticed numerous auto parts on the premises."

10.     Detectives Gebbia and Venezia, as well as the prosecutors at Mr. Adams's first and second trials, never disclosed to Mr. Adams or his counsel any of the evidence indicating that Mr. Ulfers was a suspect in his wife's murder.

11.     As Detective Gebbia told Mr. Clark in 2015, although he did not receive explicit instructions from his superiors, he understood that he was not supposed to testify against Mr. Ulfers because he was a fellow officer.  Detective Venezia and Mr. Ulfers were also personally close.  Detective Gebbia stated that the two had developed a "friend relationship" throughout the course of the investigation, and were "chummy."  Detective Venezia "was protective over" Mr. Ulfers.

12.     In addition to the exculpatory evidence regarding Mr. Ulfers that was not disclosed to Mr. Adams or his counsel, the State failed to turn over additional exculpatory evidence that would have been critical to Mr. Adams's defense.

13.     Before, during, and after Mr. Adams's two trials, the State maintained that neither a murder weapon nor any physical evidence linking other suspects to the murder had ever been found.  But police reports unearthed from the DA's Office's files in 2014 demonstrated that both the murder weapon and jewelry from the Ulfers's home had been located within a month of the crime, and had been directly linked to Roland and Alice Burns, siblings with no known connection to Mr. Adams.

14.     These police reports containing exculpatory evidence were later located in a DA's Office file for an unrelated prosecution of Mr. Adams in connection with a June 1980

burglary — a prosecution which resulted in Mr. Adams's acquittal.  The Assistant District Attorneys ("ADA") who prosecuted Mr. Adams for this burglary in 1982 also prosecuted Mr. Adams in his 1983 trial for Mrs. Ulfers's murder.

15.     Although the NOPD and prosecutors were aware of various evidence directly linking the Burns siblings to Mrs. Ulfers's murder, they failed to disclose it to Mr. Adams or his counsel before trial, despite timely requests by Mr. Adams's attorney.

16.     The evidence suggesting the involvement of Mr. Ulfers and the Burns siblings in Mrs. Ulfers's murder, would have — if disclosed — completely undermined the case against Mr. Adams, which consisted exclusively of a coerced and involuntary confession that he gave while intoxicated and after almost five hours of police interrogation.

17.     Throughout the course of Mr. Adams's trials, Defendants compounded these constitutional violations.  Detectives Venezia and Gebbia perjured themselves when they testified that there had been no other suspects in the murder other than Mr. Adams.  The prosecutors from Mr. Adams's first trial deliberately misled the defense, both in pretrial discovery and at trial itself, on this same point.  The State twice made factual misrepresentations to the same effect at both the Louisiana Fourth Circuit Court of Appeal and the Louisiana Supreme Court.  Had Defendants fulfilled their constitutional and ethical obligations, Mr. Adams would never have been found guilty and unlawfully held for nearly 34 years.

18.     On May 12, 2014, Mr. Adams and the DA's Office jointly filed a motion for post-conviction relief at the Orleans Parish Criminal District Court, based largely on the suppression of exculpatory evidence before, during, and after Mr. Adams's trial.  That same day, Judge Laurie White vacated Mr. Adams's conviction and sentence, and ordered his immediate release from custody.  The DA's Office also immediately dismissed the indictment against him.

19.     On March 16, 2015, the Orleans Parish Criminal District Court entered a consent judgment, stating that Mr. Adams was "factually innocent for the crime for which he was convicted and incarcerated," and that "he did not commit any crime based upon the same set of facts used in his original conviction."  *See* Consent Judgment, *In re Reginald Adams*, No. 278-951, Div. I (Orleans Parish Criminal District Court Mar. 16, 2015) (attached hereto as Exhibit A).

20.     Mr. Adams's wrongful conviction was no innocent mistake.  Rather, it was the result of a concerted, bad-faith effort by Defendants, acting under color of state law, to falsely accuse, prosecute, and convict him of murder in violation of his clearly established rights under the United States Constitution and Louisiana state law.  Mr. Adams's constitutional rights to due process of law and a fair trial were violated when he was wrongfully convicted of murder (i) as a result of proceedings in which Defendants failed to disclose material exculpatory evidence to him and his defense team before, during, and after his trial; and (ii) on the basis of Defendants' fabrication of evidence by coercing a confession and then utilizing that confession to prosecute Mr. Adams when they knew it to be false.

21.     As a direct and proximate result of Defendants' conduct, Mr. Adams suffered injuries and damages, including but not limited to the following:  pain and suffering, severe mental anguish, emotional distress, lost income, physical illness, inadequate medical care, humiliation, injury to reputation, permanent psychological damage, and restriction of all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, personal fulfillment, family relations, travel, enjoyment, and expression.  In short, by their own reprehensible and unlawful conduct, Defendants deprived Mr. Adams of nearly 34 years of freedom.

22.     Mr. Adams now brings this Complaint against Defendants to recover damages under 42 U.S.C. § 1983 and Louisiana law for the violation of rights guaranteed to him by the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, the Louisiana State Constitution, and the laws of the State of Louisiana.

23.     Mr. Adams demands a jury trial.

## JURISDICTION AND VENUE

24.     This Court has subject-matter jurisdiction over Plaintiff's claims brought under 42 U.S.C. § 1983 pursuant to 28 U.S.C. § 1331.

25.     This Court has supplemental jurisdiction over the Louisiana state-law claims asserted herein pursuant to 28 U.S.C. § 1367.

26.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

## PARTIES

27.     Plaintiff Reginald Adams is a 62-year-old Louisiana citizen who lives in Kenner, Louisiana.  From the time of his arrest on September 20, 1980 for the murder of Mrs. Ulfers to the date of his exoneration on May 12, 2014, Mr. Adams was wrongfully held.

28.     Defendant City of New Orleans (the "City") is a political subdivision of the State of Louisiana and a municipal corporation, which was at all relevant times the employer of the defendant NOPD officers.  Defendant City is directly liable for the acts complained of herein due to its policies and practices and its hiring, training, and supervision of the defendant NOPD officers.  Defendant City is also vicariously liable under state law for the actions of defendant NOPD officers as described herein.

29.     Defendant Leon Cannizzaro, Jr., whom Mr. Adams sues in his official capacity only, is the Orleans Parish District Attorney.

30.     Defendant Harry Connick, whom Mr. Adams sues in his official capacity only, was at all relevant times prior to 2003 the Orleans Parish District Attorney and a policymaker in the DA's Office.

31.     Defendant Detective Martin Venezia, whom Mr. Adams sues in his individual capacity, was at all relevant times a detective employed by the NOPD.  Detective Venezia's employment with the NOPD was terminated in 1993.

32.     Defendant Detective Sam Gebbia, whom Mr. Adams sues in his individual capacity, was at all relevant times a detective employed by the NOPD.  Detectives Gebbia and Venezia were the lead detectives investigating the murder of Mrs. Ulfers.

33.     Defendant Detective Frank Ruiz, whom Mr. Adams sues in his individual capacity, was at all relevant times a detective employed by the NOPD and/or an investigator employed by the DA's Office.

34.     Defendant Detective Jerry Ursin, whom Mr. Adams sues in his individual capacity, was at all relevant times a detective employed by the NOPD and/or an investigator employed by the DA's Office.  Detectives Ursin and Ruiz were the lead detectives investigating a burglary of Seafood City, for which Mr. Adams was tried but acquitted.

35.     Defendant Ronald Bodenheimer, whom Mr. Adams sues in his individual capacity, was at all relevant times an ADA for the DA's Office and was the co-lead prosecutor in Mr. Adams's case.

36.     Defendants John Doe 1 and Jane Doe 1, whom Mr. Adams sues in their individual capacities, were at all relevant times employed by the DA's Office, and presented the case against Mr. Adams to the grand jury that indicted him.

37.     Defendants John and Jane Does 2–10 are as-yet unknown individuals who, on information and belief, participated in or are responsible for the actions that are subject to this lawsuit.  To the extent that any of them can be said to be policymaking authorities whose actions represent the government entities with which they are associated, or to the extent that any of them acted under color of law, Mr. Adams sues them in their official capacities.

38.     Defendants ABC Insurance Companies 1–10 are as-yet unknown insurance companies who, upon information and belief, have issued and currently have in effect one or more policies of insurance covering one or more of Defendants named herein.

**FACTUAL BACKGROUND**

**A.     Introduction**

39.     On the night of October 7, 1979, Cathy Ulfers, the 24-year-old wife of NOPD officer Ronald Ulfers, was shot seven times in her home.  Police arriving on the scene at approximately 10:00 p.m. that evening discovered her lying inside a side entrance of her home in New Orleans East.

40.     The police agency investigating Mrs. Ulfers's death was the NOPD. NOPD's lead investigating detectives on the case were Detectives Venezia and Gebbia.

41.     According to Detectives Venezia and Gebbia's testimony at Mr. Adams's trial, they investigated the Ulfers murder for months without developing any significant leads.

42.     In reality, Detectives Venezia and Gebbia quickly developed critical information pointing to suspects other than Mr. Adams.  Detectives Venezia and Gebbia located the murder weapon soon after the Ulfers murder, traced that murder weapon, and in October 1979 arrested Roland Burns, an individual with no connection to Mr. Adams.

43.     Ballistics analysis performed by NOPD Sergeant Allen Tidwell on the pellets recovered from Mrs. Ulfers's body in late October 1979 revealed that all seven pellets came from a .32 caliber revolver, and all were fired from the same gun.

44.     Although not revealed by the NOPD at Mr. Adams's trial, in 1983, the NOPD tested the weapon linked to Roland Burns, and that testing indicated that the gun was the murder weapon.  NOPD arrested Burns in October 1979 in connection with possessing property stolen from the Ulfers's home.  According to the DA's Office file, Detective Venezia communicated that the Ulfers murder investigation was ongoing and Burns was a suspect, as was his sister, but further prosecution on the stolen goods charge could jeopardize that investigation. As a result, the charges against Burns were nolle prossed in late 1979.

45.     Several months later, in February 1980, Detectives Venezia and Gebbia heard "from talk in the street" that Mr. Adams and two other men — John Dupart and Anthony Calcagno — were involved in the Ulfers murder.  The NOPD continued to investigate the Ulfers murder into the spring and summer of 1980 without success.

46.     On June 20, 1980, Seafood City, a restaurant on Broad Street in New Orleans, was burglarized.  Detectives Ursin and Ruiz were assigned to investigate that case.  On July 31, 1980, the NOPD arrested Mr. Adams, Mr. Dupart, and Mr. Calcagno for the Seafood City burglary.

47.     On July 12, 1982, Mr. Adams was acquitted on the Seafood City burglary charges.  ADAs Ronald Bodenheimer and Harold Gilbert Jr. were the prosecutors in the burglary case, and in that capacity had access to the DA's Office file on the Seafood City burglary.  As explained in greater detail below, ADAs Bodenheimer and Gilbert also represented the State in Mr. Adams's 1990 prosecution for the murder of Mrs. Ulfers.

48.     While awaiting trial for the burglary offense, Mr. Adams was held at the Orleans Parish Prison ("OPP"), where he spoke with two OPP-inmate tier representatives (prisoners who serve as liaisons between prisoners and the OPP staff in particular housing units, tiers, or floors) — Irving Anderson and Freddie Cannon.

49.     Detective Ursin also reached out to Sergeant Charles Little of the Orleans Parish Sheriff's Office and asked him to place two "reliable informants" — referring to Anderson and Cannon — in the cell with Mr. Adams, with instructions to gather information about both the Seafood City burglary and the Ulfers murder.

50.     According to the NOPD detectives, on the evening of September 19, 1980, Mr. Adams asked Anderson and Cannon to contact Detectives Ursin and Ruiz to discuss the Seafood City burglary.  Detectives Ursin and Ruiz, in turn, contacted Detective Venezia, who was still investigating the Ulfers murder.

51.     Later that evening, Detectives Venezia and Ruiz questioned Mr. Adams about the murder of Mrs. Ulfers.  The detectives questioned Mr. Adams late into the evening and into the following morning.  During the hours of extended interrogation, during which Mr. Adams did not have a lawyer, the detectives questioned Mr. Adams about both the Seafood City burglary and the murder of Mrs. Ulfers.

52.     According to NOPD records, Mr. Adams made two confessions to the Ulfers murder:  the first at 4:15 a.m. on September 20, 1980, after approximately 4.5 hours of unrecorded interrogation, and a second confession later that morning at approximately 6:50 a.m. Between the two confessions, the detectives took Mr. Adams to the scene of the Ulfers murder, which had been badly damaged by a fire in December of the previous year.  In the course of this interrogation in the early morning hours of September 20, the officers plied Mr. Adams with

alcohol and drugs, believed to be Valium, and threatened to implicate his wife in the Seafood City burglary if Mr. Adams did not confess.

53.     In the course of his first coerced confession, at approximately 4:15 a.m., Mr. Adams told the police that he and Mr. Dupart were sent to the Ulfers's house to kill a "police lady" at Mr. Calcagno's instruction.  Mr. Adams said that he and Mr. Dupart met up with Mr. Calcagno after the murder, and that Mr. Calcagno gave them $5,000 each as payment for the contract killing.  Detective Venezia, expressing skepticism at the contract-killing story, further prodded Mr. Adams.  Eventually, Mr. Adams told the police that he and Mr. Dupart had burglarized the Ulfers's house on their own, that Mrs. Ulfers had surprised them when she returned home, and that he shot her in a panic.  Mr. Adams further told Detective Venezia that he had obtained the gun used in the murder from Mr. Dupart that same day, and that he had given it to Mr. Calcagno after the murder.

54.     Following that confession, at around 6 a.m. on September 20, 1980, Detectives Venezia, Ursin, and Ruiz (as well as Mr. Anderson, one of the tier representatives) also took Mr. Adams to the crime scene.  The detectives purchased beer, soft drinks, and snacks on the way.  According to Detective Venezia, Mr. Adams was able to describe how he and Mr. Dupart had entered the house and where he had shot Mrs. Ulfers, and to identify the different rooms of the house (despite the fact that, by the time the detectives brought Mr. Adams to the house, it had been gutted by a fire).

55.     When the detectives, Mr. Anderson, and Mr. Adams returned to the OPP, Mr. Adams gave another taped confession at approximately 6:50 a.m. on September 20, 1980.

56.     On October 9, 1980, Mr. Adams was indicted for the first-degree murder of Mrs. Ulfers.  Mr. Dupart and Mr. Calcagno were also arrested and charged with the murder,

but their charges were later nolle prossed in March 1981 because the NOPD did not uncover any

evidence linking them to the Ulfers murder and both denied any involvement.

57.     Mr. Adams was tried for the murder of Mrs. Ulfers in August 1983, during

which trial Ronald Bodenheimer and Harold Gilbert represented the State.

58.     ADAs Boddenheimer and Gilbert had, the prior year, unsuccessfully

prosecuted Mr. Adams for the Seafood City burglary.

59.     The State failed to disclose to Mr. Adams and his defense team the

following pieces of exculpatory evidence that directly undercut the State's theory at trial:

    a.    The NOPD had developed a variety of evidence implicating Mr. Ulfers in his wife's murder.

    b.    The NOPD had located the murder weapon within three weeks of the crime.  Specifically, Sergeant Tidwell had confirmed that a weapon found in the possession of a man named Milton Holmes was "definitely" the revolver that fired the bullets taken from Mrs. Ulfers's body.

    c.    The NOPD had traced the gun to various people with no connection to Mr. Adams.  Specifically, the NOPD's investigation had revealed that Alice Burns had access to the gun on October 6, 1979 while staying in the home of Linda Jones, the gun's owner.

    d.    On the DA's recommendation, the NOPD had arrested Ms. Burns's brother, Roland Burns, for possession of stolen property and as an accessory Mrs. Ulfers's murder.  Upon Mr. Burns's arrest, Detectives Gebbia and Venezia had found Mr. Burns to be in possession of a bracelet stolen from the Ulfers's home.

    e.    Mr. Anderson and Mr. Cannon, the two tier representatives to whom Mr. Adams allegedly initially communicated about the burglary, had been intentionally placed in the same cell as Mr. Adams by Sergeant Little in order to obtain information about the murder.

**B.     The State's Evidence at Trial Told Only Part of the Story.**

60.     At trial, the State's case against Mr. Adams consisted entirely of the two

confessions he gave to Detective Venezia in the early-morning hours of September 20, 1980.  No

physical evidence ever connected Mr. Adams to the murder, and there were no witnesses linking Mr. Adams to the crime.

61.     The State alleged that Mr. Adams and Mr. Dupart were burglarizing the Ulfers's home when Mrs. Ulfers surprised them, and that Mr. Adams panicked and shot her four times in the body and three times in the head to ensure that she could not later identify him or Mr. Dupart.

62.     Detective Gebbia testified as to the items purportedly stolen from the Ulfers's home.  He further testified that no ballistics tests had been performed aside from the tests on the pellets retrieved from Mrs. Ulfers's body, and that the murder weapon had never been found.  According to Detective Gebbia's testimony, he and Detective Venezia did not develop any other suspects before identifying Mr. Adams as a suspect.  Detective Gebbia testified only at Mr. Adams's first trial.

63.     Detective Venezia testified about Mr. Adams's confessions and the trip with Mr. Adams to the Ulfers's house on September 20.  Detective Venezia confirmed that there had been no other suspects in the murder other than Mr. Adams.

64.     The State read into evidence a stipulation from Sergeant Tidwell that the seven pellets recovered from Mrs. Ulfers's body had all been fired from the same gun — a .32 caliber weapon.

65.     Mr. Anderson testified that Mr. Adams had approached him only about the June 1980 Seafood City burglary, not about the Ulfers murder.  He said Mr. Adams volunteered to also discuss the murder with the detectives, and that Mr. Adams had directed them to the Ulfers's home after they left OPP the morning of September 20, 1980.  Mr. Cannon, the other tier representative, refused to testify against Mr. Adams when called to the stand.

66.     The defense's case was that Mr. Adams's confessions were false, and that he had been coerced by the detectives and fed information about the crime before the taped confession.  The defense identified multiple inconsistencies and inaccurate statements in Mr. Adams's confessions, and emphasized the amount of time Mr. Adams had been questioned by the detectives, without a lawyer present, before finally giving his first tape-recorded confession.

67.     Mr. Adams testified at his first trial in 1983, but not his second in 1990. Mr. Adams's testimony during his first trial was that the tier representatives at OPP told him that the NOPD wanted him to implicate Mr. Dupart and Mr. Calcagno in the murder, and that if he did so, they would let him go.  Mr. Adams testified that he was given alcohol and several Valium pills before he confessed.  Moreover, Mr. Adams testified that he had directed the police to a Harley Davidson dealership, not the Ulfers's home.  Mr. Adams also testified that Detective Venezia had drawn a map to allow him to direct them to the correct location.  Mr. Adams maintained his innocence, emphasizing that he told the police what he thought they wanted to hear so he could get out of jail and back to his wife.

68.     On August 13, 1983, Mr. Adams was wrongfully convicted of the murder of Mrs. Ulfers.  On August 31, 1983, Mr. Adams was sentenced to life without the possibility of parole.  Mr. Adams's first conviction was reversed by the Louisiana Supreme Court in 1989, and Mr. Adams was retried and again wrongfully convicted in 1990.

**C.     Exculpatory Evidence Was Never Disclosed.**

69.     Before both of his trials, Mr. Adams, through counsel, timely sought discovery from the State, including any exculpatory or impeachment evidence, and specifically requested the results of any and all ballistics tests.  Yet, the State failed to disclose material exculpatory information, including two supplemental NOPD reports that were only recently turned over.

70.    The first NOPD report ("First Supplemental Report"), which was located in the DA's Office file for the Seafood City burglary, spans the period from October 7, 1979 — the night of the Ulfers murder — to November 5, 1979 — the date Roland Burns was booked for possession of stolen goods and accessory to first-degree murder.  A copy of the First Supplemental Report also appears in the DA's Office file for the arrest of Mr. Burns on the charge of possession of stolen things.  The First Supplemental Report, which was not disclosed to Mr. Adams's counsel before either his first or second trial, directly contradicts the trial evidence on numerous fronts, and makes clear that Detectives Gebbia and Venezia perjured themselves.

71.    In addition, a second NOPD report ("Second Supplemental Report"), authored by Detective Venezia, covers the NOPD investigation into Mr. Adams as well as Messrs. Dupart and Calcagno with respect to the Ulfers murder.  The Second Supplemental Report, which was recently found in the DA's Office files on the Seafood City burglary *and* the Ulfers murder, similarly contains exculpatory evidence that was not provided to Mr. Adams's attorneys.  The Second Supplemental Report records the NOPD investigation from February 1980 — when Detective Venezia received a tip from a source that Mr. Adams was involved in the Ulfers murder — to September 20, 1980 — the morning of Mr. Adams's coerced confession.

72.    These two critical supplemental reports were only disclosed to the defense in late 2013, following investigation by the Innocence Project of New Orleans into the circumstances surrounding Mr. Adams's conviction.  This investigation was prompted, in part, by a claim that Ronald Ulfers was involved in his wife Cathy Ulfers's 1979 murder.  Notably, by the time the Innocence Project of New Orleans received this information, Mr. Ulfers was incarcerated, after his 2006 conviction in St. Tammany Parish for the murder of his second wife.

### i.    *The NOPD located the murder weapon within three weeks of the crime.*

73.    The First Supplemental Report reflects that on October 24, 1979, Detectives Gebbia and Venezia were alerted by other NOPD officers that Mr. Holmes, an individual unaffiliated with Mr. Adams, was arrested in October 1979 and was in possession of a .32 caliber revolver similar to the one being sought in connection with the Ulfers murder.  The detectives picked up the gun and took it to the NOPD crime lab for comparison with the seven pellets taken from Mrs. Ulfers's body.

74.    Sergeant Tidwell, a senior ballistics analyst at the NOPD crime lab, examined the pellets and determined that they were all fired from the same gun — a .32 caliber, seven-shot revolver.  Due to unusual markings on the pellets, Sergeant Tidwell believed that the gun was likely foreign-manufactured, possibly German.  The gun confiscated from Mr. Holmes was a .32 caliber, seven-shot revolver manufactured by a German company.  On October 25, 1979, Sergeant Tidwell contacted Detectives Gebbia and Venezia and told them that the gun confiscated from Mr. Holmes was "definitely" the revolver that fired the bullets taken from Mrs. Ulfers's body.

### ii.    *The NOPD traced the murder weapon to individuals with no connection to Mr. Adams.*

75.    The First Supplemental Report also reflects that Mr. Holmes told Detectives Venezia and Gebbia that Mr. Holmes's brother, Marvin Holmes, had brought the gun to Mr. Holmes's house the night before Mr. Holmes was arrested and left it there.  An interview with Marvin Holmes revealed that he had stolen the gun on October 20, 1979 from Linda Jones. Through several interviews with Ms. Jones in late October 1979, the detectives learned from Ms. Jones that she had received the gun from a coworker around September 22, 1979, and immediately lent it to a neighbor for safekeeping.  Ms. Jones took the gun back around October

2, 1979, and was in possession of the gun from at least October 2 until October 20, when it was stolen by Marvin Holmes.  (The murder of Mrs. Ulfers occurred on October 7.)

76.     Ms. Jones told the detectives that a man named Roland Burns had tried to borrow and later purchase the gun, both of which requests she refused.  Ms. Jones recalled that on October 9, 1979 —two days after the murder — Burns had tried to sell her a diamond ring similar to one that Detective Venezia had shown her.  (Detective Venezia had obtained a copy of a ring stolen from the Ulfers's home and showed it to Ms. Jones.)

77.     Ms. Jones also told the detectives that Mr. Burns's sister, Alice Burns, had stayed in Ms. Jones's home the night of October 5, 1979.  As Ms. Jones recalled, she left her apartment to go to work the morning of October 6, 1979 ( the day before the murder), leaving Ms. Burns alone in her apartment for some time with access to what was later identified by NOPD ballistics testing as the weapon used to murder Mrs. Ulfers.

78.     On October 9, 1979, two days after the murder, Ms. Jones noticed that the gun, which she kept on a shelf in her bureau in her apartment, had been moved from the top shelf where she normally kept it to a different, lower shelf.  Ms. Jones later told detectives that the lock on her back door was broken, so anyone could have easily entered her apartment through the back door.

79.     According to Ms. Jones, Ms. Burns resided at a motel on Chef Menteur (about 2.5 miles from the Ulfers's home on Downman Road).  On October 29, 1979, after learning this information from Ms. Jones, the detectives interviewed the manager of the motel where Ms. Burns was staying.  The manager confirmed that Ms. Burns had been living at the motel.  The manager further told the detectives that Ms. Burns checked in on October 1 and left on October 8, the day after the murder.  The manager also provided the detectives with a

registration card confirming the dates of Ms. Burns's stay.  The manager recalled Ms. Burns leaving "in such haste" that she left a number of items behind and failed to pay her remaining rent.

80.     Based on this information, the detectives interviewed friends and family of the Burns siblings and learned that the duo were heroin addicts who often committed crimes together.  They were told that while Mr. Burns would likely be uneasy about committing a murder, Ms. Burns was "very likely" to commit a murder.

### iii.   The NOPD arrested Roland Burns, who was in possession of a bracelet stolen from the Ulfers's home.

81.     On October 29, 1979, based on information from Ms. Jones, Detectives Gebbia and Venezia located Mr. Burns and took him into custody.  A search of Mr. Burns's person revealed a gold bracelet in his pocket similar to one that had been stolen from the Ulfers's home.  Mr. Burns told the detectives that he purchased the bracelet from a man on the street.  On November 5, 1979, Mr. Ulfers confirmed that the bracelet was the one stolen from his home.

82.     As for the diamond ring Mr. Burns had tried to sell to Ms. Jones (which resembled another item stolen from the Ulfers's home), Mr. Burns claimed that his wife had stolen the ring—a claim the detectives later determined to be false.

83.     On November 5, 1979, based on his possession of property stolen from the Ulfers's home, and the link between Mr. Burns and the weapon, Detectives Gebbia and Venezia booked Roland Burns for possession of stolen property and as an accessory to the first-degree murder of Mrs. Ulfers on the recommendation of the DA's Office.

### iv.    Irving Anderson and Freddie Cannon were intentionally placed in the same cell as Mr. Adams in order to obtain information about the murder.

84.    At both of Mr. Adams's trials, Mr. Anderson and Mr. Cannon were presented as two tier representatives who happened to have been assigned to Mr. Adams's tier. However, the second supplemental report shows that this was not the case.

85.    Around February 1980, Detective Venezia reportedly began hearing "street talk" that Mr. Adams was involved in the murder of Mrs. Ulfers, but he could not corroborate that street talk.  Detective Venezia wrote in the Second Supplemental Report that when Mr. Adams was arrested for the Seafood City burglary in July 1980, Detective Ursin asked Sergeant Little to place two "reliable informants" in the cell with Mr. Adams with instructions to gather information about both the Seafood City burglary and the Ulfers murder.  Sergeant Little selected Mr. Anderson and Mr. Cannon and instructed them to contact him if Mr. Adams started talking.

### v.    The NOPD and the DA's Office actively suppressed and lied about the exculpatory evidence at trial and throughout the appeals process.

86.    Detectives Venezia and Gebbia perjured themselves on the stand (Detective Gebbia during Mr. Adams's first trial, Detective Venezia during both), and the State allowed this perjury to go uncorrected.  The State also responded falsely to the defense's discovery motions, and misrepresented the facts in its briefs to both the Louisiana Fourth Circuit Court of Appeal and the Louisiana Supreme Court.  Despite knowing that the NOPD reports contained exculpatory information, the State — including but not limited to Defendant Bodenheimer — failed to provide these reports in discovery.

87.    Detective Gebbia testified only at Mr. Adams's first trial, during which he testified that, during the investigation of Mrs. Ulfers's murder, he and Detective Venezia did not develop any other suspects, and that nobody other than Mr. Adams, Mr. Dupart, and Mr.

Calcagno was ever suspected of the crime. Detective Gebbia further testified that none of the

property stolen from the Ulfers's house on the night of the murder had ever been recovered.

Finally, Detective Gebbia testified that no ballistics tests had been performed aside from the tests

on the pellets found in Mrs. Ulfers's body, and that the murder weapon had never been

recovered. To the State's last question, "Officer, was there any other evidence relative to the

murder that we haven't talked about today," Detective Gebbia answered, "No, sir." All of these

answers constituted perjury.

88.     Detective Venezia testified at both trials. Although he mainly testified

about the circumstances of Mr. Adams's confessions, he also testified about alternative suspects,

or rather, the lack thereof. At the first trial, Detective Venezia testified that, before he learned of

Mr. Adams in February 1980 (when a jailhouse informant first heard that Mr. Adams was

involved in the murder), "[t]here was no suspect, there was no someone we would call a

suspect." At Mr. Adams's second trial, Detective Venezia maintained that there had been no real

leads until Mr. Adams became a suspect months after the crime. As he testified, "There was no

evidence at all. There were no fingerprints. All we had were some spent pellets, no witnesses.

All we had was a dead body in the house. There was no way to tie anyone to the murder unless

they would tell anybody." These statements were all untrue.

89.     The defense filed at least three discovery motions prior to trial. In its

responses to those motions, the State lied. For example, in response to various questions asking

whether any items of evidence were seized in this matter, the State consistently responded,

"None." In fact, the murder weapon and a bracelet belonging to Mr. Ulfers had been seized. In

addition, the State responded to other related follow-up questions (such as who the owner of each

seized piece of evidence was) with answers of, "Not applicable." In response to general

questions requesting any exculpatory evidence, and for the names of any people who had

information exculpatory to the defendant, the State consistently answered, "None," or "Not

applicable."  Each of these responses was demonstrably false.

90.     Perhaps the most glaring example of misrepresentation by the State in its

responses to the defense's requests for discovery came in its handling of very specific questions

regarding ballistics or other scientific tests.  In a Motion for Bill of Particulars and Motion for

Discovery and Inspection, both filed by Mr. Adams's counsel on October 31, 1980, the defense

requested copies of reports of any scientific examinations and tests conducted in this case,

including, specifically, any and all ballistics tests and experiments.  In its March 23, 1981

responses, the State claimed that no such tests were performed.  As we now know, this is

perfectly untrue — Sergeant Tidwell analyzed the murder weapon and, after comparing it to the

spent pellets, concluded that it was definitely the gun used to kill Mrs. Ulfers.  This information

was contained in the State's files and known to them, and they therefore lied to the defense when

they claimed that no such tests were performed.

91.     In its briefs to both the Louisiana Fourth Circuit Court of Appeal and the

Louisiana Supreme Court on Mr. Adams's first appeal, the State wrote that "[i]t was later

determined [after the murder], that several items were missing, including cash and jewelry, but

the property was never recovered."  In support of this statement, the State cited to Detective

Gebbia's perjured testimony at the first trial that the NOPD had never recovered any of the

property stolen from the Ulfers's home.  In its briefs to both courts on Mr. Adams's second

appeal, the State wrote that, "[f]or almost a year, police investigators were unable to discover any

evidence in the case."  The Supplemental Reports shows that these statements were also false —

the NOPD discovered a substantial amount of evidence within three weeks of the crime.

92.     The defense, in its briefs, echoed the same position — that no property was ever recovered, and that no real leads had been developed until nearly a year after the crime, which demonstrates that the defense was not in possession of the newly discovered evidence prior to trial or thereafter.  In written opinions, the Louisiana Fourth Circuit Court of Appeal and the Louisiana Supreme Court relied upon and adopted the State's version of events.  The Louisiana Fourth Circuit Court of Appeal wrote in its opinion related to the first appeal that "[t]he homicide detectives worked full-time on the case for several months, but no real leads were uncovered until September 19–20, 1980, almost a year after the murder, when the defendant confessed to the crime."  The Louisiana Supreme Court noted in ruling on the State's writ that "[p]olice investigators did not discover any evidence in the case until September 19–20, 1980, approximately one year after the crime."  On Mr. Adams's second appeal, the Louisiana Fourth Circuit Court of Appeal again wrote that, "[d]espite an extensive investigation in this matter, police were unable to discover any evidence until approximately one year after the murder."

**D.     The Defendants Manufactured Evidence By Eliciting a False Confession.**

93.     In addition to withholding several pieces of material exculpatory evidence from the defense, Defendants also actively manufactured evidence prior to trial and presented false and misleading evidence before and at trial in order to build a case around Mr. Adams's erroneous confession.

94.     The flaws and factual inaccuracies in Mr. Adams's confession were known at trial, and the problems with Mr. Adams's confession are even more troubling given the information about the other suspects in the case contained in the First Supplemental Report. Below is a chart comparing what Mr. Adams told the NOPD Defendants with the actual facts:

| Issue | Mr. Adams's Statement | The Truth |
|---|---|---|
| How many times was the victim shot? | 4–5 times | 7 times |
| What kind of gun was used to kill the victim? | A .38 caliber gun | A .32 caliber revolver |
| What was the sex of the victim? | Male (Adams corrected his original statement (after stating that it was a male twice) to say that it was a female after some fairly leading questions from Detective Venezia) | Female |
| What did the victim look like? | Dark-haired, approximately 5'10" | Blond-haired, approximately 5'6" |
| How did the perpetrator(s) get into the house? | Through the back door (The Ulfers's home really only had two doors — a front door and a side door — but no back door, per se.) | Through the front door |
| What sort of lock was on the door the perpetrators came through? | A deadbolt with a key in it | A spring latch |
| What time was the victim shot? | About 7:30–8:00 p.m. | Approximately 9:30 p.m. |
| What was stolen from the victim's home? | A television, about $2,500 in cash, a walkie talkie, two pistols | Jewelry, about $3,000 in cash, a police radio, a police jacket<br><br>No guns; no television |
| What rooms were ransacked in the house? | Only the master bedroom | The childrens' bedroom, the master bedroom, the den, the bathroom, the master bathroom, and the hallway |
| Were NOPD commendations taken off the walls? | No | Yes |

### E. The DA's Office's Maintained Unconstitutional Policies Regarding *Brady* Material.

95.     The failure to disclose exculpatory evidence in Mr. Adams's case and other cases prosecuted by the DA's Office was no mistake.  Rather, it was indicative of (1) a

custom, practice, and policy to suppress such evidence; and (2) the DA's Office's failure to train its prosecutors regarding their obligations under *Brady v. Maryland*, 373 U.S. 83 (1963).

96.     Under *Brady*, a State violates a defendant's constitutional due process rights by withholding or failing to disclose evidence that is "favorable to the defense and material to the defendant's guilt or punishment."  *Smith v. Cain*, 132 S. Ct. 627, 630 (2012). Evidence is "material" when there is "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *United States v. Bagley,* 473 U.S. 667, 678 (1985).  The Supreme Court has made clear that the *Brady* obligation includes both impeachment evidence and exculpatory evidence, *id.* at 676; *Giglio v. United States*, 405 U.S. 150, 154–55 (1972); that the prosecutor has an obligation "to learn of any favorable evidence known to the others acting on the government's behalf . . . including the police," *Kyles v. Whitley*, 514 U.S. 419, 437 (1995); and that the materiality inquiry "turns on the cumulative effect of all such evidence suppressed by the government," *id.* at 421.

97.     A limited pre-complaint investigation has identified numerous similar *Brady* violations committed by the DA's Office.  These violations and other relevant evidence paint a picture of an office that — as a matter of custom, practice, and policy — simply disregarded its *Brady* obligations.

98.     Former District Attorney Harry Connick, who was at all relevant times the chief policymaker in the DA's Office, espoused a fundamentally incorrect and unconstitutional interpretation of *Brady*'s requirements.   In other proceedings, Mr. Connick has testified that *Brady* requires production of evidence only where it "exculpates the accused," as opposed to evidence that is merely "favorable" to the defense.  Joint Appendix at 148–50, *Connick v. Thompson*, 131 S. Ct. 1350 (2011) (No. 09-571), 2010 WL 2360634 ("*Thompson* Joint

Appendix, Vol. 1").  Additionally, according to Mr. Connick, there could be no *Brady* violation arising out of "inadvertent conduct of [an] assistant under pressure with a lot of case load."  *Id.* at 159.

99.     Further, the DA's Office manual during Mr. Connick's tenure failed to even acknowledge that impeachment evidence is *Brady* material that prosecutors are obligated to disclose.

100.     Consistent with this flawed interpretation of *Brady*, the DA's Office adopted and applied an incorrect and unconstitutional standard for discharging its *Brady* obligations.  This incorrect and unconstitutional interpretation of *Brady* was followed by line prosecutors as a matter of custom, policy, and practice.

101.     The DA's Office's grossly deficient policies and procedures and the *Brady* violations in this case are part of a pattern of strikingly similar *Brady* violations over a period of time that began in the 1970's and continued through the time of Mr. Adams's prosecution, conviction, incarceration, and subsequent appeals and petitions for post-conviction relief.  To illustrate:

102.     *Earl Truvia and Gregory Bright:*  In 1976, Earl Truvia and Gregory Bright were convicted of murder and spent over a quarter century in prison for a crime they did not commit.  Before their trial, Truvia and Bright made a request to the DA's Office for *Brady* materials and specifically requested: 1) the FBI "rap sheet" of any witnesses the State planned to call at trial; and 2) written statements or interviews obtained by the State through police investigative procedures from co-defendants, accomplices or any other person.  On the first inquiry, the State responded, "Defense is not entitled to this information," and on the second, the State responded, "State is not in possession of any."  In so doing, the State suppressed the *Brady*

evidence in its possession, including "a police report and attached statements" containing exculpatory evidence based on additional suspects in the murder, as well as "evidence concerning the mental history and reputation for truthfulness of the State's sole eyewitness."  *See Truvia v. Connick*, 577 F. App'x 317, 320 (5th Cir. 2014).  In 2002, their convictions were vacated on post-conviction review based on these *Brady* violations.  In 2003, after the Louisiana Supreme Court denied the State's application for certiorari, the State dismissed all criminal charges against Truvia and Bright.

103.   *James Carney*:  In 1976, James Carney was convicted of murder.  The Louisiana Supreme Court later reversed Carney's conviction because of the State's failure to disclose that it had agreed to dismiss battery charges pending against a key witness in exchange for her testimony at trial.  Before trial, Mr. Carney had specifically requested "evidence materially favorable to the defendant either as direct or impeaching evidence," and the State falsely replied that it had none.  As the Louisiana Supreme Court concluded, this testimony "was important to the case, and the State failed, after defendant's proper request, to inform him of the agreement," thus warranting reversal under *Brady* and *Giglio*.  *State v. Carney*, 334 So. 2d 415, 419 (La. 1976).

104.   *Floyd Falkins*:  In 1976–77, Floyd Falkins was convicted of armed robbery and sentenced to imprisonment at hard labor for thirty years.  On appeal to the Louisiana Supreme Court in 1978, the court reversed Falkins's robbery conviction because the DA's Office failed to reveal exculpatory information that two of the State's eyewitnesses had earlier misidentified one of the three robbers.  *State v. Falkins*, 356 So. 2d 415 (La. 1978).  The eyewitness identification of Falkins was the sole basis for his conviction.  The ADA prosecuting the case had been specifically informed that the two eyewitnesses had made a mistaken

identification of a robber, yet she testified that "if formally ordered to reveal exculpatory information at the time, she would not have felt obliged to reveal this initial misidentification [because] the misidentification of one of the three robbers is not necessarily exculpatory of the accused himself." *Falkins*, 356 So. 2d at 417.  The Louisiana Supreme Court made clear that the prosecutor was in error by failing to disclose it, "especially since the state's whole case depended on eyewitness identification." *Id.*

106.  <u>Arthur Moore</u>:  In 1974, Arthur Monroe was convicted of armed robbery and sentenced to 20 years imprisonment.  At trial, the victim stated during cross-examination that he had given a statement to police, and the defense requested it, but the prosecutor objected and the objection was sustained.  The Fifth Circuit reversed the district court's denial of Monroe's habeas petition because it found that the prosecutor had withheld the victim's pre-trial statement and that the statement was impeachment evidence that likely affected the verdict.  *Monroe v. Blackburn*, 607 F.2d 148 (5th Cir. 1979).

106.  <u>Larry Curtis</u>:  Curtis was convicted of second-degree murder and sentenced to life imprisonment.  On appeal in 1980, the Louisiana Supreme Court reversed Curtis's murder conviction because the State failed to disclose that the only eyewitness to the murder had viewed a group of photographs of the defendant and failed to identify the defendant as the murderer.  This was revealed only when the defense counsel viewed the DA's file after Curtis's conviction and saw the exculpatory evidence.  *State v. Curtis*, 384 So. 2d 396 (La. 1980).

107.  <u>William Perkins</u>:  In 1980, Perkins was convicted of first degree murder and sentenced to life imprisonment.  In 1982, the Louisiana Supreme Court reversed the conviction in part because the DA's Office failed to disclose, despite the defendant's request, a State's witness's previous inconsistent statement.  *State v. Perkins*, 423 So. 2d 1103 (La. 1982).

108. _Stephen Rosiere_:  In 1984–85, Stephen Rosiere was convicted for second-degree murder and sentenced to life imprisonment at hard labor.  The defense requested all exculpatory evidence and the State provided a list of names and addresses, but failed to disclose the names of two other witnesses or provide statements given to NOPD homicide detectives working on the case.  These statements directly contradicted other witness statements and cast doubt on the credibility of the State's witnesses.  On appeal in 1986, the Louisiana Supreme Court reversed his conviction in part on this basis.  _State v. Rosiere_, 488 So. 2d 965 (La. 1986).

109. _Isaac Knapper_:  In 1979, Knapper was tried and convicted of murder.  At trial, Knapper's defense counsel requested exculpatory information.  The DA's Office responded that the "defendant is not entitled."  _State v. Knapper_, 579 So. 2d 956, 957 (La. 1991).  However, the DA's Office was in possession of a police report that directly contradicted the State's evidence and witness testimony.  During the evidentiary hearing, the prosecutor testified that the DA's file was turned over to the defense.  The Louisiana Supreme Court found that "[t]he prosecutor's testimony that he turned over his file to deceased defense counsel is contradicted, not only by the absence in the record of his responding to the discovery request for exculpatory evidence, but also by the presence in the record of his response to the prayer for oyer which denied defendant's entitlement to the requested information."  _Id._ at 959.  The court therefore reversed Knapper's murder conviction.

110. _Tyrone Smith and Troy Wilkerson_:  In 1989, Tyrone Smith and Troy Wilkerson were convicted of second-degree murder and sentenced to life imprisonment.  Before trial, the defense requested rap sheets for all of the State's witnesses and "any exculpatory information or evidence favorable to the defense" from the DA's Office.  The State responded that they were "[n]ot entitled" to the rap sheets and, on the request for exculpatory or favorable

information, that there was "[n]one known at this time." *State v. Smith*, 591 So. 2d 1219, 1225 (La. Ct. App. 1991).  Yet, the Louisiana Fourth Circuit Court of Appeals found that an agreement likely existed between the State and its only eyewitness to the crime in exchange for his testimony.  The witness was held on other charges, but the DA's Office released him and refused all charges against him on the same day.  As a result, the court reversed the defendants' convictions and remanded for a new trial.

111.    *Alfred Oliver*:  In 1994, Alfred Oliver was convicted of robbery and kidnapping and sentenced to serve 50 years at hard labor for robbery and 15 years for each of his two kidnapping convictions.  *State v. Oliver*, 682 So. 2d 301 (La. Ct. App. 1996).  Later, he was resentenced to ninety-nine years at hard labor on the robbery count as a quadruple felony offender.  The essence of the State's case against Oliver depended on the credibility of two of the State's witnesses at trial.  However, the DA's Office withheld the witnesses' contradictory prior statements from the defense.  The Louisiana Fourth Circuit Court of Appeals reversed the conviction and sentence on the basis of this *Brady* violation.

112.    *Eugene Lindsey*:  In 1988, Lindsey was convicted of murder and sentenced to life imprisonment at hard labor. At trial, Lindsey's defense was intoxication, and the jury heard testimony from only two witnesses regarding the defendant's intoxication.  However, two eyewitnesses had also given statements to the police that Lindsey was intoxicated when he shot the victim.  The Louisiana Fourth Circuit Court of Appeals granted Lindsey's application and found that the trial court erred in ruling that the witnesses' exculpatory statements did not have to be disclosed.  *State v. Lindsey*, 844 So. 2d 961 (La. Ct. App. 2003).

113.    *Juan Smith*: In 1995, Juan Smith was convicted of five counts of first-degree murder.  After exhausting his appeals, Smith challenged his murder conviction based on

the DA's Office's failure to disclose *Brady* material.  Specifically, Smith had obtained files from the police's lead investigator that contained statements regarding the credibility of the State's key witness.  The Supreme Court overturned Mr. Smith's conviction based on the State's failure to disclose evidence that could have impeached the State's eyewitness where the witness's testimony was the only evidence linking Mr. Smith to the murder.  *Smith v. Cain*, 132 S. Ct. 627 (2012).

114.   <u>*Dan Bright*</u>:  In 1996, Dan Bright was convicted of murder and sentenced to death.  On appeal, he was rendered guilty of second-degree murder and resentenced to life imprisonment at hard labor.  Bright presented an alibi defense and the State used the criminal records of his defense witnesses to impeach their testimony.  Yet, the DA's Office suppressed the criminal history of its own star witness, the only witness to identify the defendant, by responding "not entitled" to the defense's pre-trial request for the State witnesses' rap sheets.  *State v. Bright*, 875 So. 2d 37 (La. 2004).  Thus, the Louisiana Supreme Court reversed Bright's conviction.

115.   <u>*David Mahler*</u>:  In 1998, David Mahler was convicted of manslaughter and filed for habeas relief in federal court.  At trial, the DA's Office had in its possession pretrial statements of their witnesses that was in direct contradiction of the witnesses' testimony.  The Fifth Circuit found that this *Brady* violation required that the writ of habeas corpus be granted.  *Mahler v. Kaylo*, 537 F.3d 494 (5th Cir. 2008).

116.   On information and belief, the DA's Office failed to take adequate remedial measures to address these numerous *Brady* violations, including by revising its policies, conducting sufficient training, or taking disciplinary action against the prosecutors involved.

117.    Instead, the DA's Office continued its pattern and practice of *Brady* violations — and specifically, the failure to turn over exculpatory witness statements — even as Mr. Adams appealed his conviction, moved for post-conviction relief, and steadfastly maintained his innocence.

118.    The blatant violation of Mr. Adams's constitutional rights under *Brady* was not an isolated incident in the DA's Office, but rather was the direct and actual result of an unconstitutional policy concerning the requirements of *Brady* and the office's failure to train and supervise its ADAs regarding the prosecution's duty to disclose exculpatory evidence to the defense.

119.    Mr. Connick resisted efforts to hold his prosecutors accountable for *Brady* compliance because it would "make [his] job more difficult[.]"  Joint Appendix at 543, *Connick v. Thompson*, 131 S. Ct. 1350 (2011) (No. 09-571), 2010 WL 2360635 ("*Thompson* Joint Appendix, Vol. 2").  During his tenure, Mr. Connick testified that he never disciplined or fired a single prosecutor for violating *Brady*.  *Thompson* Joint Appendix, Vol. 1 at 151-52.  Mr. Connick recognized that the DA's office lost four cases before the Louisiana Supreme Court by 1985, including *State v. Carney*, 334 So. 2d 415, 419 (La. 1976), in which the court found that the DA's Office had committed *Brady* violations.  *Thompson* Joint Appendix, Vol. 2 at 452-53.  Even following the aforementioned capital case *Kyles v. Whitley,* 514 U.S. 419 (1995), in which the Supreme Court reversed based on the DA's Office failure to disclose favorable evidence to the defense, Mr. Connick stated that he was satisfied with the DA's Office's practices and saw no need for any changes.  *Thompson* Joint Appendix, Vol. 1 at 153-54.

120.    It was entirely foreseeable that the DA's Office's deficient *Brady* policies and procedures and failure to adequately train on *Brady* would result in *Brady* violations committed by DA's Office prosecutors.

121.    For example, the record in the Truvia and Bright case described above also reflects the DA's Office failure to train and supervise its ADAs on this issue.  Specifically, Bill Campbell, an intern with the DA's Office in 1977 and later an ADA in that office for two years, stated in an affidavit that he received no training on how to respond to discovery requests for *Brady* material and that the supervising ADAs instructed him to write "not entitled" in response to these requests.  He explained that the DA's Office unwritten policies on *Brady* material were to be "as restrictive as possible" and "when in doubt, don't give it up."  Also, he stated that the DA's Office's alternative was to "deny the Brady request as 'not entitled' and effectively pass the buck to the judge if indeed the criminal defendant pursued the information."

122.    Henry Julien, one of the district attorneys involved in the Truvia and Bright cases in 1975 and later deposed in the Section 1983 case, conceded that he could not recall any specific training or written policies on *Brady*.

123.    In addition, Mr. Julien was trained that as long as he did not possess witness statements to the police, he did not have a duty to contact the police or produce police reports reflecting statements of the State's witnesses.  Julien explained that he did not believe that he had any affirmative duty to search from criminal histories or rap sheets of the State's witnesses under his *Brady* obligations.  Therefore, he did not have to produce them even if they included exculpatory evidence.

124.    The case of John Thompson provides further evidence of these unconstitutional policies.  Mr. Thompson spent 18 years in prison, including 14 years on death

row for a crime that he did not commit.  The record in Mr. Thompson's case reveals numerous facts evidencing the DA's Office policy and practice of withholding *Brady* material.  Indeed, Mr. Connick stipulated that the DA's Office had not provided or identified any written policy concerning *Brady* before a February 1987 policy manual, and that his ADAs could not recall any specific *Brady* training prior to 1985:  "None of the district attorney witnesses recalled any specific training session concerning Brady prior to or at the time of the 1985 prosecution of Thompson."  Specifically, former ADA Michael Riehlmann testified that he did not recall that he was "ever trained or instructed by anybody about [his] Brady obligations."  Other prosecutors, including Jim Williams and Bruce Whittaker, agreed that they were not trained on *Brady*.

> ### vi.    *Mr. Adams was wrongfully convicted as a result of the same practices and conduct of the DA's Office violating defendants' constitutional rights.*

125.    Apart from the above violations, the DA's Office's unconstitutional policy as to *Brady* is evident in the numerous *Brady* violations in Mr. Adams's case.  As described above, over the course of Mr. Adams's prosecution, the DA's Office withheld numerous pieces of material exculpatory evidence.  Additionally, consistent with the cases described above, the DA's Office followed the same policy of flatly denying the existence of such evidence in discovery responses and court papers.

126.    On information and belief, DA's Office prosecutors have similarly withheld potentially exculpatory *Brady* material or otherwise violated the constitutional rights of criminal defendants on other occasions, consistent with a pattern and practice of such violations.

127.    The repeated suppression of exculpatory material by DA's Office prosecutors in violation of *Brady* was known to the DA's Office, such that there was an obvious need to take steps to control, train, or supervise in order to prevent future similar constitutional violations.  The failure of the DA's Office to take such actions to control, train, or supervise

DA's Office prosecutors amounted to deliberate indifference to the unconstitutional practices of these prosecutors, directly resulting in the violation of Mr. Adams's constitutional rights and Mr. Adams's injuries as alleged herein.

**F.      The NOPD Implemented Unconstitutional Policies Regarding *Brady*.**

128.     The NOPD's failure to disclose exculpatory evidence in Mr. Adams's case and other cases was also no mistake.  Rather, it was indicative of  (1) a custom, practice, and policy to suppress such evidence, and (2) the NOPD's failure to train its officers regarding their obligations under *Brady v. Maryland*, 373 U.S. 83 (1963).

129.     A limited pre-complaint investigation identified numerous similar *Brady* violations committed by the NOPD.  These violations and other relevant evidence paint a picture of a police department that — as a matter of custom, practice, and policy — simply disregarded its *Brady* obligations.

130.     The NOPD's unconstitutional custom, practice, and policy concerning *Brady* is illustrated by the following incidents, which occurred during the relevant period.

131.     *Norman Clark*:  In 1974, Norman Clark was convicted of heroin distribution in Louisiana state court.  At trial, his defense team secured subpoenas compelling the testimony of material eyewitnesses to the transaction upon which Mr. Clark's conviction was based.  However, these eyewitnesses, both of whom were police informants, "were made unavailable . . . by the government."  Specifically, the informants "had been sent to Florida with spending money and at government expense through the combined efforts of state and federal officials."  An NOPD lieutenant testified at Mr. Clark's trial "that it had been his suggestion to send [the eyewitnesses] out of Louisiana."  Indeed, it was the NOPD lieutenant who provided the eyewitnesses with spending money for their trip.  After Mr. Clark was convicted, one of those eyewitnesses came forth "with testimony that exculpate[d]" him.  In subsequent federal habeas

proceedings, the United States Court of Appeals for the Fifth Circuit found that the actions of the NOPD had "flagrantly violated" Mr. Clark's constitutional right to due process, and held that his "conviction [could not] be allowed to stand." *See Clark v. Blackburn*, 632 F.2d 531 (5th Cir. 1980).

132. *Raymond Lockett*: In 1974, Raymond Lockett was also convicted of heroin distribution in Louisiana state court. "The State's evidence at trial tended to show that Lockett sold heroin to an undercover agent in the presence of two confidential informants," but when Mr. Lockett's lawyer "attempted to locate and subpoena" those informants, "[h]e was unable to do so," because the government had "willfully concealed [them] from the trial court." In other words, "the State had deliberately made key witnesses unavailable for [Mr. Clark's] trial." The two informants who would have testified at Mr. Lockett's trial were the same two informants who would have testified at Mr. Clark's, and the same NOPD lieutenant orchestrated their unavailability. The United States Court of Appeals for the Fifth Circuit later found that the NOPD's "concealment of a named eyewitness whose testimony would admittedly be material constitute[d] a prima facie deprivation of due process." *See Lockett v. Blackburn*, 571 F.2d 309, 313 (5th Cir. 1978).

133. *Curtis Lee Kyles*: In 1984, Curtis Lee Kyles was convicted of first-degree murder and sentenced to death in Louisiana state court. Although his defense team requested any exculpatory or impeachment evidence from the State before trial, the State responded that there was "no exculpatory evidence of any nature." However, following Mr. Kyles's conviction, it emerged that the State had been in possession of at least six evidentiary items that "would have entitled a jury to find that the eyewitnesses were not consistent in the describing the killer, that two out of the four eyewitnesses testifying were unreliable, that the most damning physical

evidence was subject to suspicion, that the investigation that produced it was insufficiently probing, and that the principal police witness was insufficiently informed or candid."  In proceedings before the United States Supreme Court, the State of Louisiana took the position that "some of the favorable evidence in issue . . . was not disclosed . . . to the prosecutor until after trial," even though it had been "known . . . to [NOPD] police investigators."  In other words, the NOPD's failure to turn over material and exculpatory evidence in its possession caused the *Brady* violations at Mr. Kyles's trial.  The Supreme Court ultimately held that Mr. Kyles was entitled to a new trial because "the net effect of the evidence withheld by the State . . . raise[d] a reasonable probability that its disclosure would have produced a different result."  *See Kyles v. Whitley*, 514 U.S. 419, 438 (1995).

134. *John Floyd*:  In 1980, John Floyd was convicted of second-degree murder in Louisiana state court.  At Mr. Floyd's evidentiary hearing, Mr. Jack Peebles, a former DA's Office prosecutor who had been Chief of Trials and First Assistant, stated that, "[a]t the time [Mr. Floyd's] case went to trial it was possible for the NOPD to have information about a case that was not transmitted" to the DA's Office, and that "[i]t was not the regular practice of ADA's at the time to seek out information from the NOPD that was not provided to them."  *See* Petition for Writ of Certiorari for Defendant-Appellant, *Floyd v. Cain*, 132 S. Ct. 1535 (2012) (No. 11-5987).

135. As the preceding cases demonstrate and as this Court has recently observed, "the NOPD's failings" with regards to investigative techniques "are notorious and have been extensively documented."  *Hill v. New Orleans City*, No. 13-cv-2463, 2015 WL 222185, at *17 (E.D. La. Jan. 13, 2015).

G.      **The NOPD Implemented Unconstitutional Policies Regarding Coerced Confessions.**

136.    The NOPD's coercion of Mr. Adams's involuntary confession in his case and others was also no mistake.  Rather, it was indicative of (1) a custom, practice, and policy to coerce such involuntary confessions; and (2) the NOPD's failure to train its officers regarding their obligations under the Fifth and Fourteenth Amendments regarding the coercion of involuntary confessions.

137.    A limited pre-complaint investigation identified numerous similar violations committed by the NOPD.  These violations and other relevant evidence paint a picture of a police department that — as a matter of custom, practice, and policy — simply disregarded its obligation to refrain from coercing involuntary confessions.

138.    The NOPD's unconstitutional custom, practice, and policy concerning coerced confessions is illustrated by the following incidents, which occurred during the relevant period.

139.    _Toxi Jackson_:  In 1978, Toxi Jackson was charged with possession of dilaudid with intent to distribute.  One of the most important pieces of evidence developed against her was a confession that she had given to the NOPD.  However, the trial judge excluded her confession in a pre-trial suppression hearing on the ground that it had been involuntarily given, based on the conduct of the NOPD officers who interrogated her.  The Supreme Court of Louisiana later affirmed the trial judge's ruling.  *See State v. Jackson*, 381 So. 2d 485, 487 (La. 1980).

140.    _Kevin Seward_:  In 1979, Kevin Seward was convicted of first-degree murder in Louisiana state court.  Mr. Seward's confession, which he had given to the NOPD, was introduced at trial over the objection of defense counsel.  Mr. Seward later challenged his

conviction on appeal, arguing that his confession should have been excluded because it was coerced by the NOPD.  The Louisiana Supreme Court agreed, finding that Mr. Seward's confession had not been "freely and voluntarily given," and reversed his conviction.  *See State v. Seward*, 509 So. 2d 413, 414 (La. 1987).

141.    *Harold Taylor, John Bonner, and Ruben Scott*:  In 1974, murder charges were brought against Harold Taylor, John Bonner, and Ruben Scott in federal court in connection with the killing of a police officer.  The principal evidence of their guilt that the State offered was their signed confessions.  However, the court dismissed the charges against them when information surfaced that their confessions had been coerced by the NOPD during interrogation.  *See generally* Andrea J. Ritchie & Joey L. Mogul, *In the Shadows of the War on Terror: Persistent Police Brutality and Abuse of People of Color in the United States*, 1 DEPAUL J. FOR SOC. JUST. 175, 189–90 (2008).

### FIRST CAUSE OF ACTION
### (42 U.S.C. §1983:  *Brady* Claim Against Detectives Venezia, Gebbia, Ruiz, and Ursin)

142.    Mr. Adams repeats and incorporates by reference each of the preceding paragraphs.

143.    Defendants Venezia and Gebbia were in charge of investigating the murder of Mrs. Ulfers.  Detectives Ruiz and Ursin were in charge of investigating the Seafood City burglary.

144.    Despite having in their possession exculpatory evidence that demonstrated that the case against Mr. Adams had no merit, Defendants Venezia and Gebbia did not disclose this evidence to Mr. Adams's attorneys.

145.    The evidence suppressed by Defendants Venezia, Gebbia, Ruiz, and Ursin was exculpatory as to Mr. Adams' responsibility for the murder of Mrs. Ulfers because it

was material to Mr. Adams's innocence, would have directly contradicted the confessions that underlay the State's case, and would have implicated other suspects unrelated to Mr. Adams.  In addition, this evidence was favorable to the accused because it could have been used to impeach witnesses at trial who falsely testified regarding the homicide investigation.

146.    After Mr. Adams had been imprisoned for nearly 34 years, the exculpatory evidence was revealed and the DA's Office agreed to file a joint motion to vacate Mr. Adams's conviction and dismiss the indictment.

147.    Mr. Adams's conviction was vacated.

148.    As a direct result of Defendants Venezia, Gebbia, Ruiz, and Ursin's conduct, Mr. Adams endured an unfair trial, was falsely convicted of murder, served nearly 34 years in prison for a crime he did not commit, and suffered the additional damages described above.

149.    The actions of Defendants constitute, among other things, a violation of Mr. Adams's right to due process and a fair trial under the Fifth, Sixth, and Fourteenth Amendments to United States Constitution; Articles 1.2, 1.5, and 1.16 of the Louisiana Constitution; and under 42 U.S.C. § 1983.

## SECOND CAUSE OF ACTION
### (42 U.S.C. § 1983: *Brady* Claim Against Defendants Bodenheimer, John Doe 1, and Jane Doe 1)

150.    Mr. Adams repeats and incorporates by reference each of the preceding paragraphs.

151.    Despite having in their files exculpatory evidence that demonstrated the case against Mr. Adams had no merit, Defendants Bodenheimer, John Doe 1, and Jane Doe 1 did not disclose this information to the defense.  Specifically, they responded "None" and "Not

applicable" to discovery requests for items of evidence that were seized, exculpatory evidence, and evidence of the ballistics tests and experiments.

152.    In fact, the DA's Office's files included a supplemental report that revealed the extent of the NOPD's investigation and the NOPD's deliberate placement of informants Mr. Cannon and Mr. Anderson with Adams to elicit information on the burglary and murder.  These exculpatory files were later identified in the DA's Office files relating to Defendant Bodenheimer's unsuccessful 1982 prosecution of Mr. Adams on an unrelated burglary charge.

153.    The suppressed evidentiary materials were exculpatory as to Mr. Adams's responsibility for the murder of Mrs. Ulfers because they were material to Mr. Adams's innocence, and would have directly contradicted the confessions that underlay the State's case and implicated other suspects unrelated to Mr. Adams.  In addition, this evidence was favorable to the accused because it could have been used to impeach witnesses at trial who falsely testified regarding the homicide investigation.

154.    Mr. Adams's conviction was eventually vacated.

155.    As a direct result of Defendants Bodenheimer, John Doe 1, and Jane Doe 1's conduct, Mr. Adams endured an unfair trial, was falsely convicted of murder, served nearly 34 years in prison for a crime he did not commit, and suffered the additional damages described above.

156.    The actions of Defendants Bodenheimer, John Doe 1, and Jane Doe 1 constitute, among other things, a violation of Mr. Adams's right to due process and a fair trial under the Fifth, Sixth, and Fourteenth Amendments to United States Constitution; Articles 1.2, 1.5, and 1.16 of the Louisiana Constitution; and under 42 U.S.C. § 1983.

## THIRD CAUSE OF ACTION
### (42 U.S.C. § 1983:  Coerced Confession and Manufactured Evidence Claim Against Detectives Venezia, Gebbia, Ruiz, and Ursin)

157.    Mr. Adams repeats and incorporates by reference each of the preceding paragraphs.

158.    Defendants Venezia and Gebbia were in charge of investigating the murder of Mrs. Ulfers.  Defendants Ruiz and Ursin were in charge of investigating the Seafood City burglary.

159.    In July 1980, after Mr. Adams was arrested for the burglary, Defendant Venezia's report reflects that Defendant Ursin reached out to Sergeant Little to place informants in Mr. Adams's cell.

160.    Defendant Ruiz plied Mr. Adams with alcohol and several Valium pills before taking his confession, and Defendant Venezia fed him details about the crime. Additionally, Defendants Venezia, Ursin, and Ruiz subjected Mr. Adams to an interrogation that lasted approximately 4.5 hours.

161.    At trial, despite having investigated alternative suspects, Defendants Venezia and Gebbia testified about the false confessions elicited and perjured themselves on the stand regarding the lack of alternative suspects developed during State's investigation.

162.    Detectives Venezia, Gebbia, Ruiz, and Ursin's concealment of evidence, manufacturing of evidence, and knowing use of such manufactured evidence, along with their misleading testimony, which actions they undertook in order to obtain a wrongful conviction, deprived Mr. Adams of his right to a fair trial, as did Detectives Venezia, Ruiz, and Ursin's coercion of Mr. Adams.

163.    The actions of these Defendants constitute, among other things, a violation

of Mr. Adams's right to due process and a fair trial under the Fifth, Sixth, and Fourteenth

Amendments to United States Constitution; Articles 1.2, 1.5, and 1.16 of the Louisiana

Constitution; and under 42 U.S.C. § 1983.

### FOURTH CAUSE OF ACTION
### (42 U.S.C. § 1983:  Manufactured Evidence Claim Against Defendants Bodenheimer, John Doe 1, and Jane Doe 1)

164.    Mr. Adams repeats and incorporates by reference each of the preceding

paragraphs.

165.    Defendant Bodenheimer was co-lead prosecutor in charge of prosecuting

Mr. Adams for <u>both</u> the Seafood City burglary charges and for the Ulfers murder.

166.    Defendants John Doe 1 and Jane Doe 1 were the prosecutors who

presented the case against Mr. Adams to the grand jury that indicted him on the Ulfers murder.

167.    From October to November 1979, Defendants Venezia and Gebbia

gathered evidence regarding the murder weapon, including ballistics analysis and Roland

Burns's connection to the weapon.  This investigation culminated with the arrest of Roland

Burns.

168.    The DA's Office nolle prossed Roland Burns's case in late 1979 because

Defendant Venezia told the DA's Office that "further prosecution of this case would jeopardize

future prosecution of [Roland Burns] and [Alice Burns] for [Ulfers's] murder."

169.    Mr. Adams was indicted for the Seafood City burglary on August 14,

1980.

170.    All of the exculpatory evidence procured in Defendants Venezia and Gebbia's investigation was later found in Defendant Bodenheimer's file for the prosecution of Mr. Adams for the Seafood City burglary.

171.    As the co-lead prosecutor on the burglary, Defendant Bodenheimer had access to the prosecution file for the Seafood City burglary following Mr. Adams's indictment for that burglary and was aware of the evidence that Defendants Venezia and Gebbia had developed regarding the Ulfers murder.

172.    On information and belief, Defendant Bodenheimer was aware of the exculpatory evidence, including the alternative suspects and ballistics analysis of the murder weapon, before Adams's confession to the Ulfers murder in September 1980.

173.    Despite having in their files exculpatory evidence, that demonstrated that the case against Mr. Adams had no merit, Defendants Bodenheimer, John Doe 1, and Jane Doe 1 did not disclose this information to the defense.  On information and belief, Defendants Bodenheimer, John Doe 1 and Jane Doe 1 conspired with the NOPD Defendants in the investigation of Mr. Adams, which included eliciting a coerced and false confession from Mr. Adams as described above, and then presented the Ulfers murder case against Mr. Adams before the grand jury.  Further, at trial, Defendant Bodenheimer elicited testimony regarding the false confessions coerced by the detectives and suborned perjury by Defendants Venezia and Gebbia regarding the State's investigation.

174.    Defendants Bodenheimer, John Doe 1, and Jane Doe 1's manufacturing of evidence and knowing use of that evidence to obtain a wrongful conviction deprived Mr. Adams of his right to a fair trial.

175.     The actions of Defendants Bodenheimer, John Doe 1, and Jane Doe 1 constitute, among other things, a violation of Mr. Adams' right to due process and a fair trial under the Fifth, Sixth, and Fourteenth Amendments to United States Constitution; Articles 1.2, 1.5, and 1.16 of the Louisiana Constitution; and under 42 U.S.C. § 1983.

**FIFTH CAUSE OF ACTION**
**(42 U.S.C. § 1983 claim against Defendants Cannizzaro and Connick for an unconstitutional policy, custom, or practice and/or deliberate indifference with respect to the discharge of the DA's Office's *Brady* obligations)**

176.     Mr. Adams repeats and incorporates by reference each of the preceding paragraphs.

177.     The DA's Office charged or indicted Mr. Adams with the murder of Mrs. Ulfers.

178.     The DA's Office failed to disclose critical exculpatory evidence to Mr. Adams before, during, or after the murder trial.  The concealed exculpatory evidence was material, and the failure to turn over this evidence gave rise to constitutional violations of Mr. Adams's rights under *Brady*.

179.     The suppressed evidentiary materials were exculpatory as to Mr. Adams's responsibility for the murder of Mrs. Ulfers because they were material to Mr. Adams's innocence, and would have directly contradicted the confessions that underlay the State's case and pointed to other suspects unrelated to Mr. Adams.

180.     Mr. Adams's conviction was eventually vacated upon a joint motion by the DA's Office and Innocence Project New Orleans.

181.     The actions of Defendants Cannizzaro and Connick constitute a violation of Mr. Adams's right to due process and a fair trial under the United States Constitution and under 42 U.S.C. § 1983.

182.    Defendants Cannizzaro and Connick, as representatives and policymakers of the DA's Office, maintained policies and procedures that were based on a fundamental and unconstitutional misinterpretation of the prosecutor's obligations under *Brady*.

183.    Defendants Cannizzaro and Connick, as representatives of the DA's Office, demonstrated deliberate indifference to Mr. Adams's constitutional rights by failing to establish policies and procedures that adequately trained, monitored, and supervised the employees of the DA's Office regarding the constitutional duty to disclose exculpatory evidence to the defense, despite the obviousness that such training, monitoring or supervision was required in order to prevent constitutional violations, and their awareness of prior incidents in which employees of the DA's Office had failed to comply with the obligations of *Brady*.

184.    Defendants Cannizzaro and Connick, as representatives of the DA's Office acting in its final policymaking authority and under color of law, demonstrated deliberate indifference to Mr. Adams's constitutional rights by adopting and maintaining constitutionally deficient policies with respect to discharging the DA's Office's *Brady* obligations, including but not limited to failing to adequately train, monitor, and supervise the employees of the DA's Office regarding the constitutional duty to disclose exculpatory evidence to the defense, despite the obvious need for such training, monitoring or supervision given that their awareness of numerous prior incidents in which employees of the DA's Office had failed to comply with the obligations of *Brady*.

185.    The general practice of withholding exculpatory evidence and failing to appropriately train was so common and well established as to constitute official policy that fairly represented the DA's Office's official custom, policy, and/or practice.  Although Defendant Cannizzaro was not directly involved in the prosecution of Mr. Adams, this general practice and

policy persisted during his tenure as Orleans Parish District Attorney in that Mr. Adams was not released until 2014.

186.    The actions of Defendants Cannizzaro and Connick and the official policy, practice, and/or custom resulted directly in the constitutionally deficient investigation and prosecution of Mr. Adams and abridged his rights guaranteed under the Fifth, Sixth, and Fourteenth Amendments to United States Constitution; Articles 1.2, 1.5, and 1.16 of the Louisiana Constitution; and under 42 U.S.C. § 1983.

187.    The official policy, practice, and/or custom of concealing exculpatory evidence and maliciously prosecuting individuals, without regard to guilt or innocence, proximately and directly caused Mr. Adams's injuries, including spending nearly 34 years in prison for a murder he did not commit as well as the other injuries stated herein.

188.    Defendants are liable to Mr. Adams for their conduct pursuant to 42 U.S.C. § 1983.

## SIXTH CAUSE OF ACTION
**(42 U.S.C. § 1983 claim against City of New Orleans for an unconstitutional policy, custom, or practice and/or deliberate indifference with respect to the discharge of the NOPD's *Brady* obligations)**

189.    Mr. Adams repeats and incorporates by reference each of the preceding paragraphs.

190.    The NOPD investigated Mr. Adams for the murder of Mrs. Ulfers, but failed to disclose critical exculpatory evidence to Mr. Adams and his defense team or the prosecution  before, during, or after the murder trial.  The concealed exculpatory evidence was material, and the failure to turn over this evidence gave rise to constitutional violations of Mr. Adam's rights under *Brady*.

191.    The suppressed evidentiary materials were exculpatory as to Mr. Adams's responsibility for the murder of Mrs. Ulfers because they were material to Mr. Adams's innocence, and would have directly contradicted the confessions that underlay the State's case and pointed to other suspects unrelated to Mr. Adams.

192.    Mr. Adams's conviction was eventually vacated upon a joint motion by the DA's Office and Innocence Project New Orleans.

193.    The NOPD demonstrated deliberate indifference to Mr. Adams's constitutional rights by failing to establish policies and procedures that adequately trained, monitored, and supervised the employees of the DA's Office regarding the constitutional duty to disclose exculpatory evidence to the defense, despite the obviousness that such training, monitoring or supervision was required in order to prevent constitutional violations, and their awareness of prior incidents in which employees of the DA's Office had failed to comply with the obligations of *Brady*.

194.    The NOPD, acting in its final policymaking authority and under color of law, demonstrated deliberate indifference to Mr. Adams's constitutional rights by adopting and maintaining constitutionally deficient policies with respect to discharging its *Brady* obligations, including but not limited to failing to adequately train, monitor, and supervise the employees of the NOPD regarding the constitutional duty to disclose exculpatory evidence to the defense, despite the obvious need for such training, monitoring or supervision given that their awareness of numerous prior incidents in which employees of the NOPD had failed to comply with the obligations of *Brady*.

195.     The general practice of withholding exculpatory evidence and failing to appropriately train was so common and well established as to constitute official policy that fairly represented the NOPD's official custom, policy, and/or practice.

196.     The NOPD's actions and the official policy, practice, and/or custom resulted directly in the constitutionally deficient investigation and prosecution of Mr. Adams and abridged his rights guaranteed under the Fifth, Sixth, and Fourteenth Amendments to United States Constitution; Articles 1.2, 1.5, and 1.16 of the Louisiana Constitution; and under 42 U.S.C. § 1983.

197.     The official policy, practice, and/or custom of concealing exculpatory evidence proximately and directly caused Mr. Adams's injuries, including spending nearly 34 years in prison for a murder he did not commit as well as the other injuries stated herein.

198.     Defendants are liable to Mr. Adams for their conduct pursuant to 42 U.S.C. § 1983.

## SEVENTH CAUSE OF ACTION
**(42 U.S.C. § 1983 claim against City of New Orleans for an unconstitutional policy, custom, or practice and/or deliberate indifference with respect to the obligations to refrain from coercing involuntary confessions)**

199.     Mr. Adams repeats and incorporates by reference each of the preceding paragraphs.

200.     The NOPD investigated Mr. Adams for the murder of Mrs. Ulfers.

201.     The NOPD obtained a confession from Mr. Adams through coercive means.  This involuntary confession was a critical component of the State's case against Mr. Adams at trial.  The taking and introduction of this coerced and involuntary confession at Mr. Adams's trial gave rise to constitutional violations of Mr. Adams's rights under the Fifth and Fourteenth Amendments to the United States Constitution.

202.    Mr. Adams's conviction was eventually vacated upon a joint motion by the DA's Office and Innocence Project New Orleans.

203.    The NOPD demonstrated deliberate indifference to Mr. Adams's constitutional rights by failing to establish policies and procedures that adequately trained, monitored, and supervised the employees of the NOPD regarding the constitutional prohibition on coerced and involuntary confessions, despite the obviousness that such training, monitoring or supervision was required in order to prevent such constitutional violations, and their awareness of prior incidents in which employees of the NOPD had failed to comply with such constitutional prohibition.

204.    The NOPD, acting in its final policymaking authority and under color of law, demonstrated deliberate indifference to Mr. Adams's constitutional rights by adopting and maintaining constitutionally deficient policies with respect to discharging the NOPD's constitutional obligation to refrain from coercing involuntary confessions, including but not limited to failing to adequately train, monitor, and supervise the employees of the NOPD regarding such constitutional duty, despite the obvious need for such training, monitoring or supervision given that their awareness of numerous prior incidents in which employees of the NOPD had failed to comply with the obligations of *Brady*.

205.    The general practice of coercing involuntary confessions was so common and well established as to constitute official policy that fairly represented the NOPD's official custom, policy, and/or practice.

206.    The actions of Defendants Cannizzaro and Connick and the official policy, practice, and/or custom resulted directly in the constitutionally deficient investigation and

prosecution of Mr. Adams and abridged his rights guaranteed under the Fifth and Fourteenth

Amendments to United States Constitution and under 42 U.S.C. § 1983.

207.    The official policy, practice, and/or custom of coercing involuntary

confessions proximately and directly caused Mr. Adams's injuries, including spending nearly 34

years in prison for a murder he did not commit as well as the other injuries stated herein.

208.    Defendants are liable to Mr. Adams for their conduct pursuant to 42

U.S.C. § 1983.


**EIGHTH CAUSE OF ACTION**
**(State Law:  Malicious Prosecution against Defendants Connick, Bodenheimer, John Doe 1,**
**and Jane Doe 1)**

209.    Mr. Adams repeats and incorporates by reference each of the preceding

paragraphs.

210.    Defendants Connick, Bodenheimer, John Doe 1, and Jane Doe 1 charged

or indicted Mr. Adams with the murder of Mrs. Ulfers.

211.    Defendants Connick, Bodenheimer, John Doe 1, and Jane Doe 1 caused

the prosecution of Mr. Adams for the murder of Mrs. Ulfers despite the fact that the case was

based around an erroneous and demonstrably false confession.

212.    Defendants Connick, Bodenheimer, John Doe 1, and Jane Doe 1 caused

the prosecution of Mr. Adams for the murder of Mrs. Ulfers despite having in their possession

exculpatory evidence that cast doubt on Mr. Adams's confession.

213.    Mr. Adams's conviction was eventually vacated.

214.    The actions of Defendants Connick, Bodenheimer, John Doe 1, and Jane

Doe 1 constitute malicious prosecution of Mr. Adams in violation of the laws of the State of

Louisiana.

215.    Defendants Connick, Bodenheimer, John Doe 1, and Jane Doe 1's malicious prosecution of Mr. Adams proximately and directly caused Mr. Adams's injuries, including spending nearly 34 years in prison for a murder he did not commit as well as the other injuries stated herein.

216.    Defendants are liable to Mr. Adams for their conduct under the Laws of the State of Louisiana.

### NINTH CAUSE OF ACTION
**(State Law:  Intentional Infliction and/or Negligent Infliction of Emotional Distress against Defendants Connick, Venezia, Gebbia, Ruiz,  Ursin, Bodenheimer, John Doe 1, and Jane Doe 1)**

217.    Mr. Adams repeats and incorporates by reference each of the preceding paragraphs.

218.    Defendants Connick, Venezia, Gebbia, Ruiz, Ursin, Bodenheimer, John Doe 1, and Jane Doe 1 did intentionally, maliciously, and with reckless disregard and deliberate indifference to Mr. Adams's rights engage in extreme and outrageous conduct in connection with the investigation and prosecution of Mr. Adams, including but not limited to, malicious and deficient investigations and prosecutions of Mr. Adams; concealing exculpatory evidence; manufacturing inculpatory evidence; and presenting and false and misleading arguments and evidence to courts and juries, and as further described herein.

219.    The unlawful, extreme and outrageous acts of these Defendants were undertaken for the purpose of ensuring that Mr. Adams was arrested, indicted, convicted, and imprisoned, so that such Defendants could secure a conviction in the Ulfers murder investigation.

220.    By their actions, Defendants Connick, Venezia, Gebbia, Ruiz, Ursin, Bodenheimer, John Doe 1, and Jane Doe 1 intended to inflict severe emotional distress on Mr.

Adams and/or knew that such severe emotional distress would be certain or substantially certain to result from their conduct.

221.    As a proximate and direct result of these Defendants' extreme and outrageous actions, Mr. Adams suffered severe emotional distress, including but not limited to the effects of losing his freedom for nearly 34 years of his life during which he was wrongly incarcerated as a result of their actions and being subject to the fear of execution following his initial capital trial, for which he is entitled to damages.

222.    Defendants are liable to Mr. Adams for their conduct under the Laws of the State of Louisiana.

### TENTH CAUSE OF ACTION
**(State Law:  Defamation Against Defendants Connick, Venezia, Gebbia, Ruiz,  Ursin, Bodenheimer, John Doe 1, and Jane Doe 1)**

223.    Mr. Adams repeats and incorporates by reference each of the preceding paragraphs.

224.    Defendants Connick, Venezia, Gebbia, Ruiz, Ursin, Bodenheimer, John Doe 1, and Jane Doe 1 published false and defamatory statements about Mr. Adams when they described Mr. Adams's alleged murder of Mrs. Ulfers, and when they otherwise described Mr. Adams's guilt for the murder of Mrs. Ulfers.

225.    In publishing these statements, these Defendants acted with actual malice, knowing that the statements were false.

226.    As a result of the actions of these Defendants, Mr. Adams suffered the ignominy of being labeled in his community as a murderer, suffered injury from his nearly 34-year confinement including, but not limited to, pain and suffering, severe mental anguish, loss of personal freedom and personal contact, and injury to reputation.

227.     Defendants are liable to Mr. Adams for defamation.

### ELEVENTH CAUSE OF ACTION
**(Direct action pursuant to Louisiana Revised Statute § 22:1269 against Defendants ABC Insurance Companies 1-10)**

228.     Plaintiff incorporates by reference all of the foregoing allegations.

229.     Upon information and belief, Defendants ABC Insurance Companies 1–10 have issued and currently have in effect one or more policies of insurance covering one or more of the Defendants named herein.  For valuable consideration received, these policies obligated Defendants ABC Insurance Companies 1–10, jointly and/or severally, to pay on behalf of their insured Defendant(s) any sums the insured Defendant(s) may become obligated to pay to Plaintiff or to indemnify their insured Defendant(s) for any sums the insured Defendant(s) may become obligated to pay Plaintiff.

230.     By reason of their illegal and unconstitutional acts, Defendants are liable to Plaintiff for all damages and injuries Plaintiff has suffered as a proximate and direct result. Upon information and belief, Defendant ABC Insurance Companies 1–10 are contractually obligated to pay these sums on behalf of the insured Defendant(s) or are obligated to indemnify the insured Defendant(s) for these sums.

231.     Upon information and belief, Defendant ABC Insurance Companies 1–10 are liable to Plaintiff for any and all damages incurred by reason of the insured Defendant(s)' acts up to their policy limits, notwithstanding the fact that the insured Defendant(s) may themselves be able to assert claims of privilege or immunity from liability.

232.     Pursuant to Louisiana Revised Statute § 22:1269 (B), Plaintiff brings a direct action against Defendant Insurance Companies 1–10 to recover any and all sums they are obligated to pay Plaintiff on behalf of their insureds or to indemnify their insureds.

## Prayer for Relief

Mr. Adams demands a jury trial and respectfully requests that this Court enter judgment against all Defendants on all counts of this Complaint: (a) awarding Mr. Adams compensatory and punitive damages in amounts to be determined at trial; (b) awarding Mr. Adams costs and reasonable attorneys' fees in this action pursuant to 42 U.S.C. § 1988; and (c) granting such other and further relief as this Court deems just and proper.

## Demand for Jury Trial

Mr. Adams demands a trial by jury on all counts set forth herein.

Respectfully submitted,

May 11, 2015

*/s/Michael W. Magner*
Michael W. Magner (Bar No. 01206)
JONES WALKER LLP
201 St. Charles Ave
Suite 5100
New Orleans, Louisiana 70170
Phone:  (504) 582-8316
Fax:  (504) 589-8316
Email:  MMagner@joneswalker.com

Christopher M. Denig* (DC Bar No 457187)
Michael E. Lechliter* (DC Bar No 981732)
Benjamin S. Haley* (DC Bar No 500103)
Caitlin R. Cottingham* (DC Bar No 1004335)
Benjamin Schrier* (DC Bar No 1021663)
David Sneed* (VA Bar No 84470)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
Phone:  (202) 662-6000
Fax:  (202) 778-6291
Email:  cdenig@cov.com, mlechliter@cov.com,
bhaley@cov.com, ccottingham@cov.com,
bschrier@cov.com, dsneed@cov.com
*Application for admission* pro hac vice *to be
filed*
*Attorneys for Plaintiff Reginald Adams*